Laramoke, Judge,
delivered the opinion of the court:
This is a congressional reference case referred to the Court of Claims for a report on the nature and character of the demand as a claim legal or equitable against the United States and the amount, if any, legally or equitably due.[1] The 22 plaintiffs are all engaged in the business of breeding, raising, and pelting mink. They claim that as a result of reliance on certain advice put out by the U.S. Department of Agriculture they suffered damages to their mink for which the defendant is liable.
The facts in this case, as determined by the court, are set forth in detail in the Commissioner’s Eeport, infra, but briefly are as follows: In 1948 and 1949 certain employees of the Department of Agriculture wrote articles which, with Departmental approval, were published in various commercial publications, and which recommended the use of chicken waste, i.e., head, feet, entrails, etc., of the fowl, as a substitute for the scarce and more expensive horse meat in the feeding of mink. At the time such recommendations were made, and at the present time, it is a known fact that ordinary chicken waste is a satisfactory substitute for horse meat in the diet of mink, and has been used as such by some mink ranchers since 1939.
In early 1941, diethylstilbestrol, which is a synthetic female sex hormone commonly known as stilbestrol, was just beginning to be used to fatten poultry for commercial purposes. This was done by implanting the drug in pellet form into the neck of the fowl. Chickens so treated are named caponettes.
It has now been scientifically established that stilbestrol, if eaten by mink in sufficient quantities, will cause partial or complete sterilization of the female. Even if it does not cause complete sterility in mink, stilbestrol tends to reduce the size of litters and inhibits lactation so that the mink kits which are born may die from want of milk. Stilbestrol may also predispose mink to fatal infections, cause loss of hair *602 and baldness, or kill the furbearing animals outright. The residue of stilbestrol remaining in the necks of slaughtered caponettes is sometimes sufficient to cause the aforementioned injuries to mink if such necks are ingested by them.
Most of the plaintiffs contend that they fed chicken waste to their mink because it was recommended for such feedings in articles written by Department of Agriculture employees and published in magazines with Departmental approval. Six plaintiffs claim that although they utilized chicken waste prior to reading the Department’s articles, they increased the amount of chicken waste they used as feed after reading such articles. All of the plaintiffs claim that the chicken waste they fed their mink included waste from caponettes, against which use the Department had not warned, and that as a result of using such feed their breeding herds were rendered sterile by the residue of stilbestrol in the waste. Furthermore, the plaintiffs contend that their total losses consist of the value of the breeder mink plus the cost of feeding and maintaining the mink for another year until they could be pelted in the next pelting season.
The plaintiffs maintain that the defendant is liable for their losses. .They allege that the Department of Agriculture was negligent in that it was aware of the dangers of stilbestrol to mink when it approved the articles endorsing chicken waste for mink feed and did not warn against the danger of stilbestrol in the chicken waste. This danger existed because caponette waste is indistinguishable from ordinary chicken waste and often mixed with it.
The defendant denies that the Department of Agriculture (hereinafter referred to as the Department) knew at the time of publication of the above-mentioned articles either that stilbestrol acted to render female mink sterile, or that remnants of stilbestrol remained in chicken waste.
As we view this case, the plaintiffs must overcome three hurdles in order to establish legal liability. First, plaintiffs must either show that the defendant was negligent in originally permitting these articles, or in not warning the plaintiffs of the dangers of stilbestrol in the chicken feed when such danger became known to defendant. • Second, plaintiffs must prove their reliance on the defendant’s actions and their *603 losses suffered thereby. Third, plaintiffs must show a legal basis for recovery in such circumstances .
In our judgment, the plaintiffs have failed to establish their claim in all of the above-outlined respects. >We do not agree with the plaintiffs’ contention that the Department was aware that stilbestrol was dangerous to mink and that remnants of it remained in chicken waste when the Department approved publication of the articles in question. The only means by which the Department could have become aware of the deleterious effects of stilbestrol upon mink would have been through the experimental research of Dr. Robert Enders, a professor at Swarthmore College, who was also a cooperative agent of the Department. He was the only person doing mink research for the Department. Beginning in 1947 Dr. Enders embarked upon a series of experiments attempting to induce ovariectomized and normal reluctant female mink to mate by injecting them with stilbestrol. His experiments revealed that when injected with stilbestrol the reluctant females started to mate, but further results showed that no young were produced from these spuriously prompted unions. However, mink, more so than other animals, are normally subject to breeding failure due to a variety of causes, and it was not until late in 1949 that Dr. Enders started to suspect that the injections of stilbestrol were causing sterility in the mink and were, therefore, responsible for the lack of production of offspring. Although the plaintiffs dispute these facts, they have not adduced sufficient evidence to successfully controvert them and prove their own version of what occurred.
Furthermore, the plaintiffs have not been able to completely support their claim that prior to 1949 the Department knew that remnants of stilbestrol remained in the necks of caponettes. However, regardless of whether the Department was aware of such conditions, it still is not determinative of this issue as plaintiffs have not proved their major contention; i.e., that the Department knew that stilbestrol was dangerous to mink. The articles under consideration merely pointed out that chicken waste was good mink feed, which is true. At the time of the publications, the defendant was not aware of the possibility of the presence of *604 stilbestrol in the feed or that it was harmful to mink. Under these circumstances, the defendant was not negligent in this respect.
Independent of its first allegation of negligence, the plaintiffs allege that the defendant was negligent in a second instance in that the defendant did not promptly caution the mink ranchers against using caponette waste when it was first put on notice of the possibility of its danger. The facts in regard thereto are these: In September and November of 1949 the Department received notice of two apparently isolated instances of poor mink production which the informants suspected might have been due to the residue of stilbestrol in the chicken waste fed to the mink. Also, in November, Dr. Eobert Enders visited two of the plaintiffs’ farms where unexplained breeding failures had occurred that year. His examination of the chicken heads being used as feed disclosed that particles of stilbestrol were present in the necks, and Dr. Enders then concluded that stilbestrol was the cause of the production failures, although he still did not understand why it acted as such. Shortly thereafter, in December of 1949, Dr. Enders submitted an article for publication in fur journals to the Department for its approval. The article concerned Dr. Enders’ attempts to promote the breeding of mink through the use of stilbestrol. It noted, however, that stilbestrol should not be given to mink pending further research and that stilbestrol was present in some chicken waste. The Department disapproved of the article as written because it set forth stilbestrol as having greater possibilities for encouraging mink to breed than the Department felt prior experimentation warranted, and the article seemed to be aimed at obtaining funds from fur breeders to further research. However, the Department did suggest that the article be rewritten along certain lines and then resubmitted for Departmental approval. This Dr. Enders declined to do. On January 6,1950, he wrote to the Department saying that it had just occurred to him that the Department should issue some warning to mink raisers of the danger of stilbestrol being present in some chicken waste. This the Department did on January 16, and the warning *605 was published in the February issue of several fur publications. The mink breeding season begins in February.
Under the circumstances as outlined here, we think the defendant acted with reasonable haste in issuing a warning to mink ranchers on the dangers of stilbestrol when such danger appeared reasonably probable. Certainly, the Department was not negligent in that it did not issue such a warning in September or November of 1949 on the basis of isolated suspicions of two among 7,000 mink ranchers, and we think that the warning issued in January of 1950 was reasonably prompt under the prevailing conditions.
Moreover, we do not believe that there was any legal obligation on the defendant to issue a warning. There was no kind of relationship at all between the defendant and plaintiffs which would give rise to this type of obligation on the part of defendant. The plaintiffs did not solicit advice from the defendant, and did not pay for it, and there is no indication that the defendant was aware of any reliance by plaintiffs on its approved articles.
In this connection it is interesting to note that of all the 22 plaintiffs who claim they fed chicken waste to their mink in reliance upon articles approved by the Department, only two of the plaintiffs state that they read the warnings put out by the Department and published in one or more of the same fur publications, and those two did not heed the warnings. Since chicken waste had been recognized as good mink tion of these articles, and the principal reason for its popularity after World War II was the shortage and increased price of horse meat which had previously been standard mink fare, we feel that considerable doubt is cast upon the amount of reliance the plaintiffs originally placed in the articles recommending the feeding thereof.
Therefore, under the facts of this case, we do not believe that the plaintiffs have a legal basis for this claim. Nor can there be actionable liability on defendant’s part even under the Federal Tort Claims Act because plaintiffs’ claim of *606 negligent misrepresentation is specifically exempted from coverage of the Act.[2]
Neither do we believe that plaintiffs have an actionable case under common law principles of negligent misrepresentation as they claim. The plaintiffs argue for application of the general rule which states that a party is liable for misrepresentation when there is a duty to disclose material facts and the party negligently or intentionally fails so to disclose.[3] Specifically the plaintiffs contend that the Department of Agriculture set itself up as a research laboratory for the mint industry in particular as well as all farmers generally, and thus is liable for any careless mistakes on its part, just as a private research laboratory would be accountable to its clients.
We cannot accept this argument. The Department of Agriculture was not organized merely to serve as the handmaiden of the mink ranchers, or even all farmers generally. The purpose of the research and experimentation carried on and supported by the Department is not only to help the farmer but also to benefit the American public through development of less costly and better quality products. In the vast majority of cases it has admirably succeeded in accomplishing these two objectives. However, when it has failed, as apparently it did in this case, we do not believe any liability should attach to it even if it were negligent, as plaintiffs alleged, but did not prove. Moreover, we can find no evidence of carelessness on the part of the Department.
The plaintiffs cite cases in support of their contention that the common law principles of negligent misrepresentation should by analogy be equitably applied in this case.[4] However, in all of the cases which were cited, the party defendant who made the misrepresentation somehow stood to gain financially at the expense of the party plaintiff by making such misrepresentation. In the present controversy there *607 was no privity of contract between the plaintiffs and defendant, no special relationship of any kind between the parties which would impose a duty upon defendant to use due care in its published articles, and no financial gain could come from the relationship.[5]
Furthermore, to allow plaintiffs recovery in this situation would put a damper on all Government experimentation. Such imposition of liability would effectively stop the Department from approving publication of many worthwhile articles when, as is usual in new research development, there is a question as to their complete accuracy.
Since we believe from the facts of this case that the plaintiffs have failed in their endeavor to show a legal liability, it follows that plaintiffs also have failed to show an equitable entitlement. To invoke equity, plaintiffs must prove that the defendant did something wrong and that they relied on the Government’s wrongdoing to their damage, which, as stated earlier, plaintiffs have failed to do.
In summary, it is the opinion of the court that (1) the Government was not negligent in approving the articles for publication; (2) plaintiffs have failed to prove their reliance upon the articles in question; (3) the defendant did not negligently fail to warn plaintiffs of a potential danger in chicken waste; (4) plaintiffs have not established a legal basis for recovery; (5) plaintiffs have no equitable basis for a claim against the defendant.
Therefore, it is our judgment that plaintiffs have neither a legal nor an equitable claim against the United States.
This opinion and the findings of fact, together with the conclusions thereon, will be certified to Congress pursuant to House Resolution 562,83d Congress, 2d Session.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Marion T. Bennett, and the briefs and argument of counsel, makes findings of fact as follows;
*608 1. This claim is before the court pursuant to H. Res. 562, 83d Congress, 2d Session, referring to the court H.R. 9265, a bill for the relief of Henry J. Krueger and others,[6] under the standard form of congressional reference pursuant to sections 1492 and 2509 of title 28, United States Code, directing that a report be submitted to Congress on the nature and character of the demand as a claim legal or equitable against the United States and the amount, if any, legally or equitably due. H.R. 9265 is a bill for relief of plaintiffs who at all times material here were engaged either full time or part time in the business of breeding, raising and pelting mint and selling the pelts so produced. They claim that having relied on certain advice of defendant, later described, they suffered damage to their mink herds for which defendant is equitably responsible in the total sum of $1,063,177.52,[7] plus interest at 4 percent from May 1, 1949, for Kirsch, Kjaer and Fisher and from May 1, 1950, for all other plaintiffs as a part of just compensation.
2. The breeding of mink is a highly competitive business, and a rancher to be successful must be familiar with the basic laws of genetics and the principles of diet, sanitation and record keeping. There are, perhaps, 7,000 mink ranchers in the United States who pelt 2,000,000 mink annually. Mink are bred annually from late February to early April *609 and whelp in late April to early June, producing normally an average of 3 to Sy2 kits per female in the herd, or of 4 to 4% kits per litter produced. The number of male and female kits is approximately equal. Pelting is about Thanksgiving time after cold weather has produced the winter pelts. The composite average number of kits per female bred and per female littering in normal breeding seasons, for all plaintiffs having records thereof, was 3.56 kits per female bred and 4.42 kits per female littering.
3. Plaintiffs herein normally bred their mink from 3 to 4 years, although mink can retain their fertility for 7 yean or more. Normally, a farmer’s breeding herd will consist of about one-third unbred kits from the previous year’s production and two-thirds proven breeders retained because they were considered the best of the herd, with consideration given to quality and size of previous litters and age. It would normally take several years to rebuild a herd of proven breeders.
4. Chicken waste is a food known to and used by mink ranchers since 1939 or before. However, horse meat was preferable, and until about 1948 when horse meat became scarce and expensive it had been the principal meat ingredient in the average mink diet.
5. Dr. G. R. Hartsough, a veterinarian and mink authority, published an article in the American National Fur News for September 1946 reporting an experiment substituting chicken waste for horse meat during the breeding season, and stating that production was satisfactory and that the growth and health of the kits were excellent. Hartsough was not connected in any way with the Federal Government.
6. At about this time diethylstilbestrol, hereafter referred to as stilbestrol or as the drug, a synthetic female sex hormone, was being considered for use in fattening poultry. An application for commercial use of the hormone had been filed with the Food and Drug Administration of the Department of Health, Education and Welfare in May 1945 and was granted on January 30, 1947. Thereafter, pellets were injected in some fowl to produce fattening. But even as late as 1949 a comparatively small percentage of poultry, about 4 percent, was so treated in defendant’s estimation. *610 This percentage varied in different sections of the country. Eventually the use of the drug on poultry increased substantially. The approved procedure is to inject a 15-milli-gram, fused pellet of the drug into the neck of the fowl at the base of the skull where it is absorbed in whole or in part between the times of injection and slaughtering. As much as 1 to 5 milligrams may remain as a pellet residue when a chicken is slaughtered. Birds so treated are called capon-ettes or capettes.
7. It is now an established fact that when sufficient stil-bestrol is eaten by mink via chicken waste, it interferes with the follicle in which the egg is growing, so in spite of breeding, few kits, if any, will be bom. It is a very powerful drug, much more powerful than the natural estrogen and is more toxic when taken by mouth than when injected. Even when not ingested in sufficient quantity to cause complete sterility in mink, stilbestrol tends to reduce the size of litters and to inhibit lactation so that kits born may die from want of milk. Stilbestrol may also predispose mink to fatal cases of urinary tract infection and cause loss of hair and baldness and in sufficient quantity may kill the animal.
8. Experimentation and research has revealed that 3 milligrams of stilbestrol can sterilize a mink and as little as 10 micrograms per day fed in breeding season will substantially reduce production. One microgram is one-millionth of a gram. Regular ingestion of small amounts of the drug is more damaging than one or two massive doses. Ten or more micrograms per day are harmful to growing mink.
9. It was believed by Dr. Robert K. Enders, a professor at Swarthmore College and leading expert on mink reproduction and a cooperative agent of the Department of Agriculture,[8] that injections of stilbestrol might prove useful in stimulating reluctant female mink to mate. Approximately 15 percent of female mink either do not mate or have offspring. Mink, more so than.other animals, are subject to *611 varying degrees of breeding failure due to a variety of causes. In the spring of 1947, both during and after mating season, Dr. Enders experimented with ovariectomized mink and normal females that had previously refused to mate. When injected with stilbestrol these reluctant females mated but produced no young. This was known and published by the Department of Agriculture in 1947. Dr. Enders had not anticipated that these mink would produce no young, but he was not surprised when this occurred. Dr. Enders did not conclude at that time that the reason that no young were produced was the possible harmful effect of stilbestrol on the reproductive organs of the mink. In an article dated August 4,1950, published in September-October 1950 in The Fur Journal and elsewhere, Dr. Enders as co-author with William Lloyd Merritts, agent, Bureau of Animal Industry, said that mink breeding failures from stilbestrol injections or feeding were only supported by circumstantial evidence and expressed the further opinion that mink deprived of this diet may return to normal breeding conditions.
10. During the 1947 mating season and two seasons thereafter, Dr. Enders continued to feel that stilbestrol was useful in stimulating reluctant mink to mate and at his own expense furnished a large number of mink farmers with supplies of stilbestrol during 1947 and through 1949 for trial, hoping to help them to attain better breeding results. He did not warn them of possible sterilization of the mink so injected because he did not know it at this time. Dr. Enders’ 1948 report, published by the Department of Agriculture, stated stil-bestrol “continues to be the most promising of the hormones in inducing breeding in mink.”
11. In September 1948 the Department of Agriculture published circular 801, written by Charles E. Kellogg and Charles F. Bassett, employees of the Department, and by Dr. Kobert K. Enders. This circular stated, “Chicken or turkey heads (with beaks chopped off) and entrails make good mink feed * * The suggestion was advanced that these materials should be fresh and handled in a sanitary manner. No reference was made to the possibility that such heads or necks might contain a residue of the drug in question or that if they did there was any possibility they might *612 be harmful to mink. There is no credible evidence such fact was then known to defendant.
12. In November 1948, at a time when neither the Department of Agriculture nor Dr. Enders understood the harmful effect of stilbestrol on the reproduction of mink, Charles F. Bassett and Ford Wilke, employees of the Department of Agriculture, with Department approval, published an article in the American Fur Breeder calling attention to dietary experiments conducted with mink, in which raw chicken waste (head, feet, entrails, etc.) was substituted for horse meat for the feeding of mink. The article called attention to Dr. Hartsough’s 1946 report. The article stated that in the defendant’s experiment being discussed “two feeding trials were conducted during the summer and fall of 1947 to ascertain how raw poultry waste compared in feeding value with horse meat for both growing and adult mink.” It went on to say that during “the summer and early fall the poultry waste used consisted largely of viscera.” It stated in summarization, “Preliminary feeding tests with kit and adult mink during the summer and fall have indicated that poultry waste * * * can be satisfactorily used either as a partial or complete substitute for horse meat. * * * We believe it is advisable to exercise great care in the handling of poultry waste. In order to avoid possible losses from food poisoning, this material should be procured while fresh, immediately processed, properly refrigerated, and thawed just prior to its use.”
No reference was made to any knowledge of the use of the drug in fattening chickens or in what effect it might have on mink. There is no credible evidence that in 1948 defendant had any clear proof that any chicken waste might be harmful to mink breeding as a result of the drug therein. Beference was made to the belief of some veterinarians that chicken waste should be thoroughly cooked to reduce the danger of food poisoning resulting from the presence of Salmonella bacteria.
13. In July 1949 Mr. Bassett published an article approved by the defendant. This article appeared in The National Fur News, entitled “Practical Economics in Feeding Mink Kits.” In this article he discussed the various food sub *613 stitutes available and referred to studies made which he said should be of interest for summer and fall feeding of growing mink. He said:
One product, formerly thrown out, concerning which you have probably heard a great deal, and which appears to hold great promise, is poultry waste. This consists primarily of the head, feet and entrails of chickens, although the heads and necks, as well as the entrails of turkeys, are also very desiralble for feeding mink.
One year’s work with growing kits has shown that poultry waste gave a faster initial growth than horse meat when these two products each constituted 35 percent of the diet. Just prior to pelting, there was no significant difference between the groups in average weight or in quality of pelt produced. A complete report of this experiment, including the safeguards that must be observed in feeding the product, was published in the Canadian and American fur farming magazines last summer and fall.
14. Over a period of many years the Department of Agriculture has published thousands of articles and recommendations based on its experiments in nearly every broad field of farming and livestock production. Practically every farmer or rancher in the country has followed or is following such recommendations in whole or in part. All plaintiffs herein maintain they saw at least one of the above-published articles and relied on them in feeding their mink herds to their damage.
15. Six of the plaintiffs had used chicken waste prior to publication of the above articles, but maintain they increased their use of chicken waste after reading one or more of these articles. All plaintiffs unknowingly obtained poultry waste from poultry treated with stilbestrol. None of plaintiffs, with one exception, had heard of the practice of treating poultry with stilbestrol, and none, including the exception, knew the danger of feeding treated poultry waste to mink at the time they included such poultry waste in their mink diet. All plaintiffs suffered herd damage or loss which they attribute to stilbestrol in chicken waste.
*614 . 16. Until the fall of 1949 the Department of Agriculture’s only source regarding the effect of stilbestrol on mink was through Dr. Enders. On September 20, 1949, Douglas Millar wrote to Charles F. Bassett, Director of the United States Fur Animal Experiment Station, Saratoga Springs, New York, mentioning he believed that possibly the mink failure of a rancher Bassett had reported on was due to the use of poultry waste which contained stilbestrol, a caponizing agent. Bassett wrote Millar on September 23,1949, that the suggested effect of stilbestrol on mink production had not occurred to him and that he would write Dr. Enders of Swarthmore College regarding this matter. Bassett also informed Millar, in reply, that chicken waste containing this product should not be used “until it was definitely established whether the result might be detrimental or not.” No similar warning was issued to others at that time. It was defendant’s position that the suspicion referred to was not a sufficient basis for a presumption that the drug in chicken waste caused the trouble and more than an isolated case would be required as the basis for a general public warning to mink raisers.
17. In early October 1949 Dr. Enders became suspicious that stilbestrol in chicken waste might have an' effect on male mink but his previous work did not indicate any influence of stilbestrol on the ovaries of the female. He felt a detrimental effect on reproduction might be expected if such chicken waste was fed over a long period of time. On October 6, 1949, he prepared a memorandum to that effect for Charles F. Bassett.
18. On November 4, 1949, Charles F. Bassett informed Charles E. Kellogg of the Department of Agriculture and Dr. Enders that Dr. H. B. Walters, a veterinarian and an experienced mink rancher, attributed his poor mink production that year entirely to the use of chicken waste treated with stilbestrol.
19. In 1949 plaintiffs Kirsch and Kjaer suffered unexplained breeding failures and sent specimens to Dr. Enders for microscopic examination. From his examination he was *615 not able to draw a conclusion as to tbe cause of tbeir losses. However, on November 27, 1949, be visited tbe two farms and talked with tbe claimants concerning tbeir experiences and as to tbe diet used. His examination of chicken beads being used by those two plaintiffs revealed particles of stil-bestrol in tbe necks. He concluded at that time that stil-bestrol was tbe cause of their production failures. Following this examination Dr. Enders submitted a memorandum to tbe Department of Agriculture on November 28, 1949, regarding tbe above failures and suggested experiments on mink with stilbestrol and with thyroxine to overcome the effects of stilbestrol.
20. On December 16,1949, Dr. Enders submitted an article for approval of tbe Department of Agriculture to be published in the various fur journals. This article noted tbe effects of stilbestrol in inducing bard-to-breed females to mate but revealed, also, that very few females produced kits after treatment with the drug. It recommended that such a powerful drug should not be used by fur farmers pending further research. It was also noted that stilbestrol was present in some chicken waste then being fed to mink.
21. On January 3, 1950, the Department of Agriculture disapproved the submitted article for publication in its existing form in a memorandum, stating in part:
* * * the introduction describing stilbestrol indicates £ eater possibility than the later contents bear out. In et, in a discussion of the work, every result noted indicates that such a powerful drug should not be used by fur farmers, at least until further research has been done.
It seems to be aimed at obtaining funds from fur breeders to further this research, although the article does not come out flat-footedly and say so. * * * Certainly the article does not contain any information about the drug which the breeder can put to use.
About all that one could say is that stilbestrol is a potent drug and that preliminary work indicates that it may have possibilities, although results, so far, have been negative and further work will be needed to obtain *616 results that will be of any help to the mink breeder. If the paper is reorganized in this way, there should be a statement cautioning the layman against the use of the drug.
* * * If the paper is rewritten, we request it be resubmitted for Bureau approval.
22. On January 6,1950, Dr. Enders submitted the following memorandum to the Department of Agriculture regarding stilbestrol in chicken waste:
It has just occurred to me since the matter of stilbestrol has been dropped, that a note of warning on the feeding of poultry waste should be issued. Since a large number of mink breeders know that we are aware of the dangers the Bureau might be exposed to serious criticism if such a warning was not issued.
Since the Bureau has published work on the feeding of chicken waste its critics might feel that it was all the more culpable if some warning were not issued after the trouble encountered by breeders had been brought to its attention. I believe that Mr. Bassett would bear out my statement that trouble with chicken waste containing stilbestrol is more widespread than we have thought possible.
23- On January 16, 1950, the Department of Agriculture submitted an article to 11 fur publications cautioning against the use of chicken waste. This article thereafter appeared in the February 1950 issue of certain publications, including the American Fur Breeder. The article stated that Dr. Enders was pursuing the investigation and that until “some definite information has been obtained it is recommended that each mink producer check the source of supply of chicken waste since possibly such feed may be safely fed only when it has been determined that no diethylstilbestrol has been used.”
24. On February 14, 1950, the Department of Agriculture Bureau of Animal Industry, issued a memorandum prepared by Mr. Bassett. This memo was mimeographed and used to answer correspondence on the subject of feeding poultry waste to mink. It paralleled closely the data released for publication in January 1950 and stated, in part:
*617 Poultry Waste From Capettes
Quite recently a drug, diethylstilbestrol, has found increased favor in the poultry industry for chemically sterilizing male chickens. This drug is injected as a pellet in the neck of the bird, and by inhibiting growth of the sex organs, increases the weight with little if any increase in food consumption. Birds so treated are called capettes. Any portions of the pellet remaining undissolved in the neck when the bird is slaughtered will, of course, be present in the poultry waste. Preliminary studies indicate that even small portions of pellets, when fed to mink, particularly kit females, can disastrously affect future reproduction.
Kanchers using poultry waste in their mink feed should ascertain immediately whether viscera and heads from capettes are included in the waste they are using, and if so, should discard such material at once, or use it next summer and fall only for feeding animals that they are planning to pelt. Capette waste should, of course, be separated from other poultry waste as processed and immediately discarded, until future studies have indicated the amount and extent of the damage likely to result from its use.
Amounts To Feed
During that period from January 1 until the kits are 7 weeks old, it is advisable to limit the amount of poultry waste in the mink diet to not more than one-third the total meat content. * * *
Summary
Until additional information from properly controlled experiments is available, the following recommendations are in order:
‡ ‡ ‡ ‡ $
2. Do not feed poultry waste from capettes either during the reproduction cycle, or during the summer, fall, and early winter to animals that may be kept over for the breeding herd.
3. During the reproduction cycle, do not replace more than one-third of the fresh meat and visceral products with poultry waste.
As more information on the feeding of poultry waste becomes available, it will be passed on to fur ranchers *618 through, articles in the trade journals or in mimeographed leaflets.
25. Plaintiff Krueger saw the February 1950 article in the American Fur Breeder, but did not stop feeding chicken waste because he did not realize his chicken waste had stil-bestrol in it until thereafter. Plaintiff Denzin saw the February 1950 article but his distributor of “Cama,” which he used as mink feed and which contained chicken waste, advised him to continue using it — that there was nothing wrong with “Carao.” The other plaintiffs who had 1950 breeding failures stated they did not read these articles at the time of publication in February 1950 at the start of that breeding season. Plaintiffs Fisher, Kirsch and Kjaer claim 1949 breeding failures. For the most part plaintiffs having 1950 failures learned of stilbestrol in chicken waste during and following the breeding season in 1950 from other sources or by being referred to the February articles by other mink ranchers.
26. After the 1950 mink breeding season was over, the defendant caused to be published in various fur journals certain articles on the comparative value of horse meat substitutes, including chicken waste. Some such articles published in May, June and July did not contain warnings about stilbestrol-treated poultry. However, other articles prepared by defendant, closely paralleling the recommendations and conclusions quoted in findings 23 and 24, were published in the fur journal's in July and August 1950. In the latter articles it was stated that:
* * * Under no circumstances should poultry waste from caponettes be fed to either adults or growing mink except to animals that are going to be pelted the following fall. Mink fed caponette waste should not be kept over for the breeding herd.
The foregoing conclusion is also reflected in the annual report of the Chief of Animal Husbandry, Department of Agriculture, 1950.
27. Plaintiffs commenced and terminated use of chicken waste on the following dates:

*619

DAMAGES
28. Plaintiffs uniformly claim that they were persuaded to use poultry waste by the recommendation in these Department of Agriculture articles, or increased their use of this product because of these articles, and that the Department of Agriculture knew in 1947, or should have known, *620 that stilbestrol was barmful to the reproduction of mink and warned ranchers not to use caponette waste. Plaintiffs maintain that the February 1950 warning was too late and too mild. Plaintiffs claim that, because of feeding poultry waste, their breeding herds became worthless as breeders and they seek payment for the value of these breeders, plus the cost of feed and care for 1 year less the salvage value of the pelts. Plaintiffs claim their entire 1950 herds, not only nonproducing mink or subnormal producers, but also those mink which were considered normal producers.
29. Defendant disclaims any liability and maintains the Department of Agriculture was unaware in 1947 — 1949 of the danger of feeding waste of stilbestrol-treated chickens to mink but as soon as it learned of this danger issued a warning to ranchers before the 1950 breeding season got under way. Defendant claims, further, that plaintiffs did not rely on the Department of Agriculture’s published articles because chicken waste had been generally known as good mink food for many years, many of plaintiffs had fed chicken waste prior to these articles, and for the most part, plaintiffs did not heed the defendant’s February 1950 warning regarding the feeding of caponette waste.
30. Defendant further maintains that many of plaintiffs failed in their proof of claim, because they had no records on which to establish the number or type of mink in their herds.
The following is a summary of the nature of available records on which plaintiffs base their claims:
(a) Ash — Plaintiff had a “day book” which reasonably established his claim of 34 females and 9 males. However, mink types were not shown. Plis original records were destroyed by rats and his claim, prepared just prior to trial, was made from a letter he wrote in August 1950 about his losses.
(b) OasteUi-GolUni — Plaintiffs’ breeding records were destroyed in 1952. The claim was prepared just prior to trial based on recollection and correspondence as to the breeding and could not be verified by defendant. Plaintiffs’ financial records show accurate numbers and prices for pelts as well as sales and purchases of mink breeders.
*621 (c) Damn — Plaintiff bad records for 1948, 1949, and 1951, but bis 1950 records were destroyed. His claim is based on bis recollection alone and could not be verified by defendant. Accurate pelting records were available.
(d) Denzin — Plaintiff destroyed tbe records from which bis claim was made and thus they were unavailable for defendant’s verification. Pelting records were available.
(e) Engstrorn — Plaintiff bad a complete set of records on which his claim was based.
(f) Fisher — Records as to type and number of mink, as well as pelts sold as claimed, were verified by defendant.
(g) Genetti — Plaintiff’s records were thrown away inadvertently about 1956. Defendant could not verify the size or composition of plaintiff’s 1950 herd. Some pelting records and certain records of purchases of breeders were available.
(h) Gessner — The size and composition of plaintiff’s claimed herd for 1950 were in accord with plaintiff’s mating record book furnished defendant.
(i) Gittelmcm — Defendant could verify 369 of the 540 female mink claimed by plaintiff for its 1950 herd, of which 203 were nonproducers. Defendant was able to verify 61 of the 142 male mink claimed, of which 3 were nonproducers. Many of the cards on which these records were kept were stated to be lost. As to females, plaintiff produced successively numbered cards stated to be for each mink in plaintiff’s herd. There were 126 cards missing.
(j) Kirsch — Kirsch’s records as to the size and composition of his 1950 herd from which his claim was made were thrown away inadvertently and unavailable for defendant’s verification. Plaintiff maintained certain pelting and purchase records.
(k) Kjaer — The composition of Kjaer’s 1949 herd as claimed was verified by defendant from plaintiff’s records.
(l) Kremer — Plaintiff’s claim for 81 nonproducing mink in his 1950 herd was verified by defendant’s audit of the records.
(m) Kroner — Plaintiff’s records were destroyed by rats and were unavailable for verification by defendant. Plain *622 tiff’s pelting record for 1950 was available from New York Auction Company records. Certain 1948 purchases as to number but not type were also available.
Subclaimant Ralph North [9] — No records to support sub-claimant’s claim were made available to defendant as they were destroyed.
(n) Krueger — The size and composition of Krueger’s claimed 1950 breeding herd was verified by defendant.
(o) Lobitz — Plaintiff’s 1950 records were destroyed by flood and were not available for defendant’s inspection and verification. The claim was prepared from such secondary records as Lobitz presently had on hand. Plaintiff’s 1949 and 1951 kit production was available, as were the pelting records.
(p) Miletich — Plaintiff had no books and records. Plaintiff had a mating record book which he claimed indicated there were 25 males and 100 females in his 1950 herd. Defendant could not make a verification of plaintiff’s herd from this record.
(q) Postma — Postma’s 1950 records as to composition of his herd, from which he made his claim, were destroyed or erased by reuse and unavailable for audit by defendant. Pelting records were available.
(r) Sward — No records were made available to defendant to verify the size or composition of plaintiff’s 1950 herd. Pelt sales for 1949 and 1950 were available.
Subclaimant Reynier — No records were available to support subclaimant Eobert Eeynier’s claim. Certain pelting receipts, however, were available.
(s) Swigert — Plaintiff produced no records on which defendant could verify the size or composition of his 1950 herd. Certain pelting records were available.
(t) Trdbert — Plaintiff produced records from which defendant could verify the size and composition of his 1950 herd as claimed.
1. Subclaimant Bernard Marvin, Beckman — There were no records available for defendant to verify subclaimant’s claim.
*623 2. Subclaimant Forrest Doherty — There, were no records available for defendant to verify subclaimant’s claim.
3. Subclaimant Roy Porter — Trabert maintained records sufficient to verify the size of Porter’s 1950 herd, but not to show the type of mink.
4. Subclaimant Henry E. Schad — There were no records available for defendant to verify subclaimant’s claim.
5. Subclaimants Freeman G. Kellenberger and Henry Kellenberger — Records reflecting the sale of 28 breeders and their types to subclaimants Kellenberger in March 1950 by Trabert were made available to defendant.
6. Subclaimant John Lu/ndstrom — Records reflecting the sale by Trabert to plaintiff of eight breeders and their types were made available and verified by defendant.
(u) Turner — Records reflecting the size and sex only of plaintiff’s 1950 breeding herd were verified by defendant. Pelting, sales and purchase records were available. An appraisal of Turner’s herds showing size and type was allegedly made in January 1950 and was available for inspection. The appraisal was not reduced to writing until September 1951.
31. Plaintiff Kromer’s claim for 54 sapphire mink and 60 dihybrids, or half blood sapphire, and his subclaimant North’s claim of eight sapphire-type mink are not reasonably supported by the evidence.
32. Once an animal was damaged by stilbestrol it was not reasonable to keep it the following year as a breeder, although in some instances a damaged mink might reproduce normally the following year, depending upon the amount of stilbestrol consumed.
33. Plaintiffs’ claimed replacement values are predicated upon three appraisals, with quality adjustments.
(a) Ralph Space, one of the nation’s leading mink breeders, appraised claimant Turner’s 1950 herd in January 1950 and signed an affidavit of this appraisal on September 10, 1951. Mr. Space had no recollection of making such an affidavit, although he conceded his signature. He was a friend of claimant Turner’s, who was trying to borrow money from a bank and to do so he needed insurance on the mink. The insurance company intended to insure the animals for *624 $40 each, and according to Turner, Space made the appraisal to assist Turner in securing a higher evaluation. Space had little experience in evaluating mink from a monetary standpoint, and the prices in the affidavit, which he considered reasonable for Turner’s herd, reflected prices which he (Space) was able to command because of his national reputation.
(b) Walter Graf, a mink farmer for many years and a well-known mink grader, signed an affidavit in February 1951 appraising the value of claimant Krueger’s 1950 herd which he had graded about November 1949 when he was helping Krueger choose which mink to pelt. Graf had never before nor since made a monetary appraisal of mink, and testified that he based certain of his evaluations upon magazine ads and upon prices that might be charged by Larry Moore, Space, himself, or some other reliable source. He did not produce or review his records from which this appraisal was made prior to testifying in 1961.
(c) George Slezak, Jr., by affidavit made in February 1954 purported to appraise from recollection the 1950 herd of claimant Gessner. Slezak had no experience in the monetary appraisal of mink and this was his only such appraisal. The prices set down in the affidavit reflected prices he himself charged for mink, prices charged by Adkins, of Utah, or Grandquist, nationally known as high quality breeders, and prices appearing in current magazine ads.
34. The panties have agreed that there is a direct relationship between the breeder value and pelt value. It is possible, however, that ranchers with good breeders could receive less than their pelt potential because of operational deficiencies, such as poor feed, housing, care, or sanitation.
Mink pelts vary on the market from day to day. However, it is reasonable to conclude that a breeder ordinarily is considered to be worth about two or three times pelt value, unless a new mutation is involved, in which case it may be much higher, depending upon the mutation. There are certain respected individuals who have a reputation for selling high quality breeders and who command a higher price than the above ratio.
*625 Female mink sold already bred, with a production guarantee, also command a higher price.
35. In 1950 the mutations which generally sold higher than the above ratio were pastels, Aleutians and sapphires. Normally it takes about 5 years after a new mutation is introduced for ranchers to drive the price down to normal supply and demand levels. The pastel was first introduced about 1943 and the Aleutian was first introduced about 1946, but good breeders still brought somewhat of a price premium over other mink in 1950. The sapphire was first introduced about 1948 and sold at a much higher premium in 1950. Since mutation mink breeders brought much higher prices during earlier years and their values dropped as the various mutations became more plentiful, a comparison of 1946 prices with those paid in 1950 for the same quality of mutation mink would be improper. A proper comparison would be limited to breeders purchased nearest to the so-called disaster period. This would limit a proper comparison to those breeders purchased during the latter part of 1949 and early 1950 for most plaintiffs and a year earlier for plaintiffs Fisher, Kirsch and Kjaer.
36. It is generally true that mink farmers do not sell their best animals as breeders but keep them in their own herd, sell their second quality as breeders and pelt their poorest quality animals. It is also generally true that purchases of breeders made by mink ranchers would normally be for higher quality animals in an attempt to improve their own herds. Quantity purchases usually carry a discount over single or small purchases.
37. Plaintiffs Gessner, Krueger, and Turner, whose appraised herds were the basis for all but three of plaintiffs’ claims herein, received pelt prices averaging 8.53 percent less than the average price received for like pelts in 1948 and 1949, from a comparison of all pelt sales from the auction houses of Lampson, Fraser and Huth, Inc., and the New York Auction Company. None of plaintiffs whose herds were appraised received average prices or better in either 1948 or 1949. Only four of all plaintiffs herein showed higher-than-average pelt prices for the same type of pelts.
*626 38. The appraisals made by Space, Graf, and Slezak, on which basis most of plaintiffs’ claims are made, contain prices for top-quality breeders which might be charged by some of the country’s leading breeding farms, all of which command premium prices, whereas the pelt sales from these appraised herds revealed they received less-than-average market prices for pelts. For all plaintiffs whose purchases and sales herein are known for the period covering the latter part of 1949 and 1950, breeder prices for the most part were substantially below the claimed value of similar type mink in their herds.[10]
39. Considering all of the evidence, it is reasonable to conclude that the appraised values used by plaintiffs were at least 40 percent higher than would be necessary for plaintiffs to replace their 1950 herds with similar animals.
40. Three of plaintiffs’ claims were not based on the aforementioned appraisals — Genetti, Gittelman and Kromer. Their claims are based on their own valuations of their herds.
Plaintiff Genetti’s average pelt price for 1948 and 1949 was $17.05. His average pelt price from 1948 to 1953 was $22.19. The pelt types are unknown. Gittelman’s pelt averages were unavailable. Kromer pelted out his entire 1950 herd at pelting time following his 1950 failure. The pelts were not affected by the feeding of chicken waste, according to Kromer. Kromer received $4,374 net, or $14.58 average for his claimed herd of 300. A reasonable estimate of his gross would be about $16 per pelt.
41. Plaintiffs Genetti and Gittelman claimed substantially more than other plaintiffs for the same type of mink. There is no credible evidence that their herds were superior to the appraised herds or the other plaintiffs’ herds.
(a) If Genetti’s claim of $88,559 was on the same basis as the appraised herds, it would be for $75,504.67, plus known additional purchases of $1,030 during late 1949 and early 1950. On the basis that the appraised herds were 40 percent overvalued, Genetti’s herd value would be $46,332.80.
*627 (b) Should Gittelman’s claim for $99,110 be on tbe same basis as tbe appraised herds, it would amount to $79,342. On tbe basis that tbe appraised herds were 40 percent overvalued, Gittelman’s herd value would be $47,605.20.
(c) Since plaintiff Kromer’s claim of 54 sapphire mink and 60 dihybrids, or half sapphire mink, is not supported by the evidence, it would be reasonable to compute his damages as three times pelt value of $16 per pelt. Assuming that Kromer’s herd was comprised of 300 mink, the value of his herd in 1950 would be about $14,400.
42. On the basis that the appraised herds were overvalued 40 percent and on the assumption that plaintiffs’ herds were correctly claimed insofar as number and type of mink are concerned, the following schedule represents the cost to replace plaintiffs’ entire 1950 herds regardless of whether certain mink produced normally:

*628

The above figures for labor or for care and feed, where not computable, are those furnished by plaintiffs and either stipulated to or not contested by defendant. Where pelt salvage was more than the cost of feed and care, plaintiffs’ claims were reduced as shown above. Where pelt salvage was less than plaintiffs’ claims for feed and care, their claims were increased by that difference.
43. Plaintiffs also claim 4 percent per annum compensatory damages from the dates of their breeding failures, which were May 1, 1949, for plaintiffs Fisher, Kirsch and Kjaer, and May 1, 1950, for all other plaintiffs.
subclaimants
44. Three of plaintiffs had subclaimants. Plaintiff Kro-mer’s subclaimant, Ralph North, allegedly purchased feed containing stilbestrol from Kromer, and subclaimant Robert Reynier allegedly purchased stilbestrol-contaminated feed from plaintiff Sivard. Plaintiff Trabert allegedly sold feed containing stilbestrol to subclaimants Bernard Marvin Beck-man, Forrest Doherty, Roy Porter and Henry E. Schad and sold breeders which had allegedly been sterilized by stilbes- *629 trol to subclaimants Freeman G. Kellenberger, Henry Kellen-berger and John Lundstrom.
Since subclaimant North’s claim of eight sapphire-type mink is not supported by the evidence, it is reasonable to compute his claim only on the basis that his breeders were worth three times pelt value. His herd of 32 animals was pelted at a net price of $359.96, or a net of $11.25 each. His gross would reasonably have been about $12.50 per pelt. On this basis his herd of 32 animals would have been worth about $1,200.
45.The following is a schedule of the subclaimants’ claims computed on the same basis as plaintiffs’ claims herein, using plaintiffs’ computations as to cost of feed and care:

46.Subclaimants also claim 4 percent per annum compensatory damages from May 1, 1950.
ULTIMATE FINDINGS
47.Defendant maintains breeders ordinarily are worth two to three times pelt value except where new mutations are involved. It contends plaintiffs’ pelting records reveal that plaintiffs’ herds are overstated in many instances, particu *630 larly wbere records of herd verification were not available. Defendant’s computation of damages, however, is not based on replacement of plaintiffs’ breeding herds, as is claimed by plaintiffs, but is based on compensating plaintiffs for loss of their profit on kit production during the pertinent year and allowing recoupment of other estimated expenses therewith except estimated feed expense. This method of computing damages is apparently based on defendant’s contention that plaintiffs’ breeders were not permanently damaged by stil-bestrol consumed in feed. Defendant’s evidence is that plaintiffs’ losses did not exceed $105,400.
48. Based on defendant’s contention that many of plaintiffs, whose records were unavailable, claimed larger herds than are reasonably supported by the evidence, and assuming defendant’s computations as to herd size are reasonably correct, when applying a corrected multiple of .35 to pelting experience, and using the higher valuation of three times pelt value rather than two times pelt value since most plaintiffs had some newer mutations, the replacement value of plaintiffs’ herds would be as follows:

*631 The above schedule does not take into consideration the salvage value of 'breeder pelts nor cost of feed and care. Pelt values normally should exceed cost of feed and care in properly operated mink ranches.
49. The evidence supports a finding that a proper computation for damages would include the replacement value of plaintiffs’ mink destroyed by effects of the drug-contaminated chicken waste or damaged so that they did not produce or produced subnormally.
The weight of evidence further supports a finding that, where there were records to support the size of plaintiffs’ herds and production figures, a proper computation as to damages can be made. Where there were no records or insufficient records on which to base size or production of plaintiffs’ herds, the evidence supports the reasonableness of defendant’s corrected computations, basing herd size principally on previous pelting experience which assumed the herds remained the same size as the previous year. There are 11 plaintiffs in this latter category, as follows:

50. In the case of eight plaintiffs there were records establishing which of their mink were normal producers and which were nonproducers or subproducers, and there was credible evidence that their herds had been fed drug-contaminated chicken waste. These eight are:
*632 Ash
Engstrom
Fisher
Gittelman
Kjaer
Krueger
Trabert
Turner
The average of normal producers in the herds of these eight plaintiffs, at the time of their failures attributed to defendant, was 9.66 percent, which percent should be applied to reduce the herd of any plaintiff whose complete herd was verified by defendant but who had no records to support how many producers, nonproducers and subproducers were in the herd. Plaintiff Gessner is the only plaintiff in this category. This 9.66 percent will not be applied to those plaintiffs having no records and whose herds are based on previous pelting experience listed in finding 49 above, which will further compensate these plaintiffs in the event they were increasing herd size rather than maintaining a stable numbered herd.
51. Plaintiff Kremer had 119 mink, of which 81 are claimed as nonproducers and allowed here as stipulated. Kremer testified that 38 producing mink were not fed poultry waste but that the others were. Kremer was not included in the group of eight other plaintiffs forming the average of 9.66 percent above, since to include his entire herd would raise this average in the face of his admission that part of it was not fed poultry waste. Further, it would be unfair to include only the 81 nonproducing mink in this average without records substantiating Kremer’s claim that the producing mink were not fed chicken waste.
52. Should plaintiffs be equitably entitled to recovery, there follows a schedule of damages suffered by each, based on the findings that a breeder is worth three times pelt value and other considerations described above which apply to particular plaintiffs. The following damages are supported by the weight of credible evidence:

*633

53. No computation of feed and care cost less salvage value is warranted herein, as normally the pelt" value should exceed the cost of feed and care in a reasonably efficient operation.
54. The evidence supports a finding that the damages of subclaimants should be allowed only where there are records that reasonably support the subclaims. Subclaimant Porter had 21 mink, of which 2 were normal producers. No pelt average was available. However, since Porter’s herd was intermingled with Trabert’s and originally came from Trabert, Trabert’s pelt average will be used to compute the value of Porter’s herd. The following is a schedule of subclaimants’ damages which are supported by substantial and credible evidence:

 Since the evidence in this case was taken, and the findings of the Trial Commissioner reported prior to the opinion of the Supreme Court in Glidden Co. v. Zdanok, 370 U.S. 530, we think it proper to file the report without reference to the Supreme Court’s opinion in that case.

 28 u.S.C. §2680(li); Jones V. United States, 207 E. 2d 563, 564, cert, denied, 347 U.S. 921, reh. denied, 347 U.S. 940.

 See e.g., International Products Co. v. Erie R.R. Co., 244 N.Y. 331, 155 N.E. 662 ; Vendt v. Duenke, 210 S.W. 2d 692, 699 (Mo. App. 1948).

 E.g., Dime Savings Bank v. Fletcher, 158 Mich. 162, 122 N.W. 540; Houston v. Thornton, 122 N.C. 365, 29 S.E. 827; Tindle v. Birkett, 171 N.Y. 520, 64 N.E. 210.

 Cf. Jaillet v. Cashman, 139 N.E. 714 (N.Y.) ; MacKown v. Illinois Publishing and Printing Co., 6 N.E. 2d 526 (Ill.) ; Curry v. Journal Publishing Co., 68 P. 2d 168 (N.M.).

 Plaintiffs in this ease are: Vesther W. Ash (1) ; Fred B. Castelli and Albert Collini, doing business as Delsea Minhery (2) ; Norbert Danen (3) ; Edward W. Denzin (4) ; Arthur Engstrom (5) ; E. T. Fisher (6) ; August H. Genetti (7) ; Felix Gessner (8) ; Gittelman’s Sons Fur Farm, Inc. (9) ; C. F. Jenness (10) ; Kirsch Fur Farm, Inc. (11) ; Frederick Kjaer (12) ; Clair Kremer (13) ; Karl Kromer (14) ; Henry J. Krueger (15) ; Frank Lobitz (16) ; John Miletich (17) ; George Postma and Henry Postma, doing business as Postma Brothers (18) ; William L. Sivard (19) ; Harold Swigert (20) ; L. D. Trabert (21) ; and Wallace D. Turner (22).
Proof was not offered on the claim of C. F. Jenness (10) and no findings are made thereon. Donald M. Clark, Dean D. Follette and Kimber Krise, parties included in H.R. 9265, are not included as parties plaintiff in the suit before the court. Gittelman’s Sons Fur Farm, Inc., was substituted by amendment as a plaintiff in lieu of C. Richard Gittelman and Kirsch Fur Farm, Inc., in lieu of Howard Kirsch.

 This is the figure asserted in plaintiffs’ requested findings of fact. The claim in the petition, as amended, totals $1,055,506.60. H.R. 9265 (House Report 1793, 83d Congress, 2d Session) states the items of the claim which there total $1,041,915.60, including Clark, Follette, Jenness, and Krise. As noted from reference to footnote 1, the parties in the House resolution and report and the original and amended petitions, as ultimately narrowed by the proof, vary slightly as to numbers and identity.

 A cooperative agent is furnished equipment and receives nominal pay from the Department of Agriculture but is not under its administrative control except that the Department approves the work to be performed, and any article published Jointly as a representative of the Department has to have the approval of the Department.

 Certain plaintiffs sold feed allegedly containing stllbestrol to otter mint ranchers who have asserted claims against them. These claims have allegedly been settled by agreement that plaintiffs would include said subclaims in their own against the United States. The subclaimants are not included in the congressional reference nor are they parties plaintiff.

 While plaintiffs’ purchases -would normally be of superior animals to improve their herds, their sales of breeders would normally not be of their best quality animals.