By the Bevxew Panel : Upon the referral of the bill (H.R. 3736, 90th Cong.) for the relief of Stephen H. Clarkson, to the Chief Commissioner of the United States Court of Claims, by the House of Representatives, and the subsequent filing of a petition by the claimant, the Chief Commissioner referred the case to Trial Commissioner James F. Davis for the conduct of further proceedings in accordance with the Rules of the Chief Commissioner. After joinder of issues, a full trial was held in San Diego, California, at which evidence was presented by the claimant and the United States.
Proposed findings of fact and briefs were submitted by the parties and on December 16,1970, Trial Commissioner Davis filed an opinion, findings of fact and conclusions in which he concluded that the plaintiff is entitled to equitable relief in the total amount of $23,518, made up of these items:
The amount plaintiff paid for assignment of the desert land entry right in 1961- $12,050
Interest at 5 percent on the above amount from May 9, 1964, for approximately 7 years- 4,218
Expenses consisting of: Legal services including costs advanced up to June 1968_ $2, 750
Services of real estate brokers in 1964_ 1, 000
Estimated cost to plaintiff of various trips and conferences_ 1, 500
- 5,250
Attorneys’ fees since June 1968_ 2,000
The claimant filed no exceptions to Trial Commissioner Davis’ report. The United States filed exceptions to the findings of fact and conclusions relating to all expenses over and above the value of the property itself in the amount of $12,050, namely, interest, attorneys’ fees and other expenses.
We concur in the finding of the Trial Commissioner as to *966 the valuation of the property at $12,050. We also concur with respect to his findings and conclusions relating to interest, and we agree in principle with those relating to attorneys’ fees and expenses.
We recognize that the payment of attorneys’ fees, interest and expenses has not attached to recommended awards in Congressional Reference cases generally in the past, although there is at least one exception with respect to interest. In Burkhardt, et al. v. United States, 113 Ct. Cl. 658, 81 F. Supp. 553 (1949), the court recommended in addition to the principal amount of recovery a reasonable rate of interest at 4% percent.
On January 2,1971, just two weeks following the filing of Trial Commissioner Davis’ decision, Pub. L. 91-646, 84 Stat. 1894 was approved. Section 304(c) provides:
The court rendering a judgment for the plaintiff in a proceeding brought under section 1346(a)(2) or 1491 of title 28, United States Code, awarding compensation for the taking of property by a Federal agency, or the Attorney General effecting a settlement of any such proceeding, shall determine and award or allow to such plaintiff, as a part of such judgment or settlement, such sum as will in the opinion of the court or the Attorney General reimburse such plaintiff for his reasonable costs, .disbursements, and expenses, including reasonable attorney, appraisal, and engineering fees, actually incurred because of such proceeding.
While the above Act relates to cases involving the taking of property by a Federal agency, we feel that this case is akin to a taking case. Indeed at one point in the proceedings, as the opinion has noted, condemnation of the plaintiff’s interest in the land involved was threatened. We feel that this enactment by the Congress has fortified the portion of the decision providing for payment of interest, attorneys’ fees and expenses.
We feel the amount of the reasonable attorneys’ fees should be reduced from a total of $4,750 to a total of $2,500, and that the expenses in connection with the reasonable value of services of real estate brokers should be reduced from $1,000 to $500.
*967 Therefore, it is recommended that Congress authorize and direct the payment to Stephen H. Clarkson, plaintiff herein, the sum of $20,768, in full payment of his equitable claim against the defendant.
The opinion, and the findings and conclusions of Trial Commissioner James F. Davis modified by the Eeview Panel to make the two reductions referred to above, follow.
OPINION
Davis, Commissioner: This case relates to H.E. 3736 of the 90th Congress, 1st Session, entitled “A bill for the relief of Stephen H. Clarkson,” which was by H. Ees. 1216 of the 90th Congress, 2d Session, referred to the Chief Commissioner of the U.S. Court of Claims pursuant to 28 U.S.C. § 1492 (1964). and 28 U.S.C. § 2509 (1965-69 Supp. V).
The essential facts are set out below. Details are in the findings of fact which accompany this opinion»
Plaintiff’s claim deals with the frustration of his plan to prove up and secure a land patent for a desert land entry in the Imperial Valley of California. By way of background, Congress has for many years provided legislation by which a citizen of the United States can file a declaration with the Department of the Interior of his intention to reclaim a tract of public domain desert land. The purpose of the legislation is to encourage citizens to develop for agricultural purposes arid lands which are otherwise unproductive. An application, properly filed, gives the applicant possessory rights to a tract of land, called a desert land entry. To prove up the entry and thus get title to the land, the applicant must do three things within four years:
(a) Develop a supply of water sufficient to irrigate all the land;
(b) Construct an irrigation delivery system from the supply of water for the land; and
(c) Cultivate at least one-eighth of the land by leveling and planting it to crops.
Pertinent statutes and regulations, administered by the Bureau of Land Management, Department of the Interior, *968 provide for granting extensions of time to applicants to make proofs, upon a showing of unavoidable delay in constructing the irrigation works due to no fault on the applicant’s part.
The land of the entry here in suit (160 acres) is located in the Imperial Irrigation District (hereinafter the District), of California’s Imperial Yalley. The District embraces some 700,000 acres of desert land which extends south 40 miles from the Saltón Sea to the Mexican border and is about 25 miles wide. Irrigation water which serves the District comes from the Colorado River and the Imperial Dam (near the Mexican border) and flows generally north through the District through two main canals, one on the east side of the District, the other on the west side. In turn, the water is distributed to the land through a number of smaller east-west canals.
The entry in suit was originally granted in 1918 to one Thomas Morgan. After several time extensions to prove up the entry, due to the unavailability of irrigation water in the District, and after an intermediate assignment from Morgan’s heirs to one Lester Hendrix, plaintiff acquired the entry in 1961 by assignment from Hendrix for $12,050. The entry land was at that time, and still is, undeveloped. It is located on the west side of the District at an elevation about 30 feet higher than the Fillaree Canal, which is a tributary canal to the east of the entry land and is the nearest source of irrigation water. The entry land has a slight southward slope, its highest point being the northwest corner. Between the entry land and the Fillaree Canal is land owned by one Mr. Westmoreland. Thus, to irrigate the entry land, it is necessary to pump water up from the Fillaree Canal and across the north part of Westmoreland’s land to the entry land, then let it flow by gravity southward through the entry land. All this, of course, requires easement rights over West-moreland’s land and installation of the necessary pumps and irrigation ditches which, in fact, were never installed.
When plaintiff acquired the entry in late 1961, water from the Fillaree Canal was available to it by virtue of a ruling of the Directors of the District, earlier sought and obtained *969 by Hendrix. Furthermore, in 1961 when Hendrix still owned the entry, the Department of the Interior extended the time to make proofs to May 9,1964. Also in 1961, 80 acres of the entry land were under lease to the Navy Department for use as part of a parachute test facility; and, under the lease, the Navy had ingress and egress rights over the other 80 acres. The lease was to expire on June 30, 1962, with an option to the Navy for a 1-year renewal to June 30, 1963. However, the lease provided that “no renewal shall extend the period of occupancy [by the Navy] beyond June 30, 1963.” The 80-acre portion of the land under lease to the Navy was that portion over which the construction of irrigation ditches and equipment was most feasible, both economically and technically.
Thus, when plaintiff acquired the entry in 1961, the situation is clear. Water was available for irrigation; and over 2 years remained to make the necessary proofs, about 10 months of which (June 30, 1963 to May 9, 1964) were free from any foreseeable leasehold interest of the Navy. The record shows that irrigation construction work on entry land situated like plaintiff’s can be done in as little as 2 months. Plaintiff therefore in 1961 had every reasonable expectation that he could prove up the entry in timely fashion.
Plaintiff’s difficulties started in 1962. Early that year, he sought to make arrangements for the necessary construction to irrigate and cultivate the entry land. However, fearful that the Navy lease would inhibit or prevent construction work, and apprehensive that the Navy might require use of the land even beyond June 30, 1963 (despite the plain language of the lease), he met with Navy Department representatives in efforts to reach some mutually agreeable accommodation. The Navy was sympathetic with plaintiff’s problem, but throughout negotiations, held to its position that “the military requirements are not compatible with agricultural development, unless an arrangement could be made to coordinate the land development with the operation of the Navy facility.” During negotiations, the Navy did not offer plaintiff the right to irrigate and agriculturally develop the leased land, and thus no “arrangement” was made.
*970 In May 1962, the Navy informed plaintiff that it elected to exercise the lease option, thus extending the lease from July 1, 1962 to June 30, 1963. Plaintiff and the Navy thereafter continued negotiations, and they both informed the Department of the Interior of the negotiations and the underlying problem. The Department’s informal response was that extensions of time to prove up the entry were still available under appropriate statutes.
In April 1963, the situation worsened. With but 2 months left of the Navy lease, plaintiff’s earlier apprehensions materialized when the Navy advised that it required a new lease to 1968. Plaintiff was willing to enter into a new lease, but only if the Department of the Interior granted an extension of time to make proofs or if the Navy agreed to permit concomitant agricultural development of the land. Plaintiff wrote to the Department of the Interior, again explaining the situation. The Department’s answer was that any request for extension of time “is a little premature” and should be made “approximately 90 days prior to the end of the statutory period May 9, 1964] * *
On June 30, 1963, the Navy lease expired. However, the Navy continued to occupy and use the land without a lease and plaintiff took no action to prevent it. Bather, plaintiff and the Navy continued to negotiate, hoping to resolve the problem in sufficient time for plaintiff to make proofs. In September 1963, plaintiff again wrote to the Department of the Interior, setting out in detail the extensive background of the conflicting problems with the Navy and requesting, among other things, an extension of time to make final proofs. The Department of the Interior did not respond for 5 months (February 1964), at which time it noted that an extension, up to 3 years, was possible only “in the event of some unmoidable delay in the construction of the irrigation work * * and that “reasons other than the Navy lease would have to be advanced to warrant consideration of an extension.”
The situation reached crisis proportions in the spring of 1964. Despite extensive efforts dating back to early 1962, no accommodation had been reached 'between plaintiff and the Navy Department; and the Navy continued to occupy and *971 use the entry land without a lease and under threat of condemnation or eminent domain proceedings. Accordingly, on March 10, 1964, plaintiff filed an application with the Department of the Interior for an extension of time to submit proofs. On March 20, 1964, the application was denied, it being noted that “the entryman has not shown that some unavoidable delay in the construction of irrigation works * * * has occurred for which he was not responsible and could not have readily foreseen * * *. The issues raised by the entryman regarding past, present and future use of the lands * * * by the U.S. Navy are not pertinent to the issue at hand regarding extensions and are not herein considered.”
On April 13,1964, plaintiff filed an appeal to the Director, Bureau of Land Management. Two days later, the situation changed dramatically. The Navy informed plaintiff that it was willing to enter into a new lease under which plaintiff could develop the land agriculturally. Plaintiff so informed the local office of the Bureau of Land Management, which, according to plaintiff, advised him that “under the new circumstances the * * * [local office] will have no hesitancy in granting * * * a three year extension of time * * However, no action was taken by the local office because of the pendency of the appeal.
Having thus resolved the problems with the Navy Department, plaintiff then took steps in April 1964 to contract for the necessary construction work to irrigate the land, even though only a month remained to submit proofs. In short, plaintiff (a) secured an easement from Westmoreland to install pumps and ditches across Westmoreland’s land, (b) made preliminary arrangements to have 20 acres (one-eighth) of the entry land cultivated, (c) got an estimate for the cost of the construction work, and (d) contracted to have the land mapped, graded and leveled. So far as the record shows, none of the work was accomplished. In December 1964, the Department of the Interior advised plaintiff that, because no time extension had been granted and the matter was up on appeal, any improvements which he might make on the entry land “would be at his own risk.”
*972 On January 7,1965, tlie Navy wrote to tbe Department of the Interior explaining in detail the changed circumstances. Nevertheless, on March 25,1965, plaintiff’s appeal was denied. The denial was bottomed on the U.S. Supreme Court’s decision in Arizona v. California, 373 U.S. 546 (1963). That decision apportioned the waters of the Colorado River among various states laying claim thereto and found that California claimed use to more than its share. Accordingly, the Department of the Interior held that “it would be contrary to the public interest to grant * * * [an extension of time to plaintiff] where the entry is situated in California and requires water from the Colorado River for its reclamation.” No mention was made of plaintiff’s earlier dealings with the Navy. Plaintiff’s entry right was canceled on April 19,1965.
Under 28 U.S.C. § 2509(c), the Trial Commissioner in Congressional Reference cases is directed to “inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant.”
It is clear that in this case plaintiff has no legal claim against the United States, and he does not contend otherwise. The action of the Secretary of the Interior, resulting in cancellation of plaintiff’s entry right, was a discretionary act under 43 U.S.C. § 336 and was not subject to judicial review under the Administrative Procedure Act, 5 U.S.C. §§ 701-06 (1965-69 Supp. V). The inquiry thus focuses on whether plaintiff has an equitable claim within the meaning of 28 U.S.C. § 2509 (c). In this sense, “equitable” is used to mean broad moral responsibility, i.e., what the Government ought to do as a matter of good conscience (Burkhardt v. United States, 113 Ct. Cl. 658, 84 F. Supp. 553 (1949)); and generally, such equitable relief must rest on some unjustified act or omission to act which caused plaintiff’s damage. But for that, any award would be a gratuity. B. Amusement Co. v. United States, 148 Ct. Cl. 337, 342, 180 F. Supp. 386, 390 (1960); Krueger v. United States, 161 Ct. Cl. 599 (1963).
The record here leaves no doubt but that plaintiff’s loss of his entry right and, in turn, his right to acquire title to the entry land, resulted from unjustified acts or omissions *973 on the part of 'both the Navy Department and the Department of the Interior. While the final decision of the Department of the Interior in 1965 not to extend time to make proofs was no doubt a proper one (based on Arizona v. California, supra), this record shows no justifiable reasons (a) why the Navy delayed until about 1 month before the entry right expired (May 9, 1964) to agree to a new lease, compatible with plaintiff’s needs, and (b) why in the first instance, the Department of the Interior, in its decision of March 20,1964, totally ignored the realities of the situation as it then existed. The original Navy lease expired on June 30, 1963, yet the Navy continued to occupy and use the land, at best as a tenant at sufferance and at worst as a trespasser. In either event, the Navy was obliged to expedite negotiations with plaintiff to resolve their conflicts. This it did not do and as a direct result, plaintiff was unable to proceed with necessary construction work to make proofs to the Department of the Interior. As for the Department of the Interior’s decision of March 20, 1964, it stated that a time extension was not appropriate because the “past, present and future use of the lands * * * by the U.S. Navy are not pertinent to the issue at hand.” [Emphasis supplied.] This decision showed gross insensitivity to plaintiff’s real dilemma, a dilemma not of plaintiff’s making and one which he did everything in his power to prevent. Had the time extension been granted in early 1964, there is no reason to believe that plaintiff would have been precluded from making necessary proofs because irrigation water was then available to plaintiff’s land. The effect of the Arizona v. California decision would not have become pertinent unless further requests for time extension had been made; and this was highly unlikely in view of the terms of the new Navy lease. Under the circumstances, therefore, plaintiff is entitled to equitable relief.
There remains to determine the amount of compensation due. H.N. 3736 proposes $40,000, which plaintiff contends was the value of the entry land between 1961 and 1964. The record does not support this contention, but rather shows that the land was worth about $12,050, the amount plaintiff paid for assignment of the entry right in 1961. (Findings 29-37). *974 In any event, the measure of plaintiff’s relief should, in fairness and good conscience, be that sum necessary to make plaintiff whole, i.e., to return him to the position he was in (to the extent money can do so) before the unfortunate circumstances leading to this suit. That sum comprises (a) the reasonable value of the entry land which the record shows is about the same as plaintiff’s investment therein, i.e., $12,050 (finding 87(a)), (b) interest totaling $4,218 for 7 years computed at 5 percent on plaintiff’s investment from May 9,1964, (finding 40), and (c) $4,500 as the reasonable cost of fees and services incurred by plaintiff in efforts to prove up the entry and to deal with the Government agencies involved, and to obtain the relief here recommended (findings 38 and 39). All this comes to $20,768. Any higher payment would be a gratuity. (Finding 41.)
Findings op Fact

Congressional Proceedings

1. (a) On January 24,1967, during the 1st Session of the 90th Congress, there was introduced in the House of Kep-resentatives, a bill, H.R. 3736, providing in part as follows:
* * * That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Stephen H. Clarkson, of 7930 Roseland Drive, La Jolla, California, the sum of $40,000 in full settlement of all his claims against the United States for the failure of the Secretary of the Interior to extend the time during which improvements are required to be made on a desert land entry (assigned to said Stephen II. Clarkson) notwithstanding the fact that such entry could not be improved because such land was leased to the Department of the Navy. No part of the amount appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, 'and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.
*975 (b) On June 12,1968, a bearing on the bill, H.E. 3736, w&s conducted by Subcommittee No. 2 of the Committee on the Judiciary to which the bill had been ref erred.
(c) On July 11, 1968, the Committee on the Judiciary of the House of Representatives in Report No. 1691 reported favorably, without amendment, a resolution, H. Res. 1216, providing as follows:
Resolved, That the bill (H.R. 3736) entitled “A bill for the relief of Stephen H. Clarkson,” together with all accompanying papers, is hereby referred to the Chief Commissioner of the Court of Claims pursuant to Sections 1492 and 2509 of title 28, United States Code, for further proceedings in accordance with applicable law.
(d) On September 17, 1968, H. Res. 1216 was adopted by the House of Representatives.
(e) On September 25, 1968, the Clerk of the House of Representatives certified and referred the pertinent documents in the case to the Chief Commissioner of the U.S. Court of Claims.

Court Proceedings

2. (a) On December 26, 1968, plaintiff filed his petition, addressed to the Chief Commissioner.
(b) On December 30,1968, the Chief Commissioner issued an order of reference to a trial commissioner and a designation of a review panel.
(c) On April 21, 1969, defendant filed its answer.
(d) On October 23,1969, a trial was conducted by a trial commissioner at San Diego, California, at which time exhibits were introduced into evidence and oral testimony was adduced by both plaintiff and defendant.
(e) In due course, the parties filed briefs and proposed findings of fact.

Plaintiff's Claim

3. Plaintiff’s claim deals with the frustration of his plan to prove up and secure a patent for a desert land entry in the Imperial Irrigation District of the Imperial Valley of California. Some pertinent background is set out below in this finding.
*976 (a) Desert land entry (DLE). Simply stated, a citizen of tbe United States may file a declaration with the Department of the Interior, asserting his intention to reclaim a tract of public domain desert land, and 'apply for a patent upon completion of the reclamation. At the time the application is filed, the applicant must deposit a fee of $15 and make payment of 250 per acre for the land he proposes to develop. Thereafter, he has four years to accomplish three things:
(1) Develop a supply of water sufficient to irrigate all of the land described;
(2) Construct an irrigation delivery system from the supply of water for all of the land within the entry, and
(3) Cultivate at least one-eighth of the land by leveling and planting it to crops.
An applicant has the right to possession of the land covered by the entry during the life of the entry, and the entry may be 'assigned. When the requirements, above noted, are accomplished and final proof is made, a patent will issue upon payment of an additional fee of $1 per acre (4-3 U.S.C. §§321-29). Because of the risks involved in perfecting a desert land entry, not all applicants succeed.
(b) Provisions for extension of time to develop a desert land entry. The statutes and regulations provide for granting extensions of time for submitting final proof of a desert land entry, at the discretion of the Secretary of the Interior, upon a showing of unavoidable delay in the construction of the irrigating works due to no fault on the part of the entryman. (43 U.S.C. §§333-34, 336; 43 C.F.R. § 2226.2-1 et seq.)
(c) The Imperial Irrigation District. The Imperial Irrigation District of the Imperial Valley of California embraces about 700,000 acres of desert land which extends south 40 miles from the Saltón Sea to the Mexican border and is about 25 miles wide. To be agriculturally productive, the land must be irrigated. Irrigation water which serves the District comes from the Colorado River and the Imperial Dam, and is fed through two main canals which run generally north and south, one on the east side of the District, the other on the west side. The water flows westerly from the Imperial
*977 Dam near the Mexican border, tbence northerly toward the Saltón Sea. The water is distributed to the land in the District through a number of smaller east-west canals. The District is divided into four units: Imperial, West Mesa, East Mesa, and Pilot Knob. The entry land here in issue lies in the West Mesa Unit, with one corner touching the Imperial Unit.
(d) Arizona v. California, 373 U.S. 546 (1963). The litigation, hereafter referred to as Arizona v. California, was instituted in 1952 to apportion the waters of the Colorado River among various claimants, i.e., Arizona, California and the United States, which has relevant treaty obligations with Mexico. The states of Nevada, New Mexico and Utah later joined in the case; and the Imperial Irrigation District was also a defendant. A master’s report to the Supreme Court was filed January 16, 1961. Before the date of the Court’s decision (1963), California was using 5.1 million acre-feet of Colorado River water annually. The decision decreed that California’s entitlement was 4.4 million acre-feet per annum when the Colorado River had 7.5 million acre-feet available for consumptive use in the lower Colorado River Basin states. The California agricultural uses of Colorado River water exceeded 3.85 million acre-feet. California also used large quantities of Colorado River water for the city of Los Angeles.
4. In 1961, plaintiff acquired by assignment from Lester Hendrix for $12,050 the desert land entry here in issue. The entry covers 160 acres of land described as follows:
N*4 of the NE'^4 and the E14 of the NWj4 of sec. 17, T. 15 S., R. 12 E., S.B.M., containing 160 acres more or less.
The entry is located on the west side of the Imperial Irrigation District (West Mesa Unit) on a mesa at an elevation about 30 feet higher than the Fillaree Canal, which is a tributary canal serving the nearby area with irrigation water. The entry land is “L” shaped. It is surrounded on three sides (north, south and west) by public domain land. To the east is a tract of land owned by Mr. Westmoreland. Westmore-land’s land lies between the entry land and the Fillaree Canal. The north boundary of the entry land is the high portion of *978 the land, with the northwest comer being the highest single point. The nearest source of irrigation water is the billaree Canal to the east. The most feasible and only economical method of irrigating the entry land is to bring water across Westmoreland’s land to the high side of the entry land and to allow it to flow by gravity through ditches to the remainder of the land. Irrigation water would thus enter the entry land at the northeast corner. The entry land has a slight southward slope, is unimproved, having no ditches or waterworks, and, in the absence of water, supports only sparse desert vegetation.
5. The entry was originally issued to Thomas Morgan on June 13, 1913. A 3-year extension of time (to June 3, 1920) was granted to Morgan under the Act of March 28, 1908, 35 Stat. 52, 43 U.S.C. § 333. Later, a suspension to prove up the entry was granted by the Commissioner of the General Land Office (from January 27,1920 to April 26,1923) when adverse action was taken against the Mount Signal Canal Company, a local source of water. Another suspension was granted on January 25, 1924, under the provisions of the Maggie L. Havens decision (A-5580), dated October 11, 1923. The Havens decision, rendered by the First Assistant Secretary of the Interior, granted a blanket extension of time to prove up many desert land entries in the Imperial Irrigation District, including the entry here in issue, until “water for the irrigation of the lands * * * becomes available.” The entry was assigned by the heirs of Thomas Morgan to Lester Hendrix in an assignment recognized by decision of the Los Angeles Land Office, dated June 2,1955. In turn, Hendrix assigned the entry to plaintiff in an assignment recognized by Land Office decision dated November 8,1961.
6. As a prerequisite to plaintiff’s purchase of the entry from Hendrix in 1961, plaintiff required Hendrix to request the Directors of the Imperial Irrigation District to include the entry land in the Imperial Unit of the District in order to ensure that a supply of water would be available when and if a right of way was obtained from Westmoreland, the adjacent landowner. It is not clear from the record whether or why inclusion of the entry land in the Imperial Unit (as *979 opposed to the West Mesa Unit) was necessary to secure irrigation water. In any event, an application to the Directors was made by Hendrix on July 27, 1961. The application was approved on September 19, 1961, and the entry was thereby included within the Imperial Unit. The Havens suspension, earlier noted, remained in effect on the Hendrix entry land until October 5, 1961, at which time the Department of the Interior removed the suspension because the land had been placed in the Imperial Unit of the District and thus had water available to it. By a decision of the Department of the Interior dated October 17,1961, an extension of time to submit final proof was granted to Hendrix to May 9, 1964, under the provisions of the Act of April 30, 1912, 37 Stat. 106, 43 U.S.G. § 334. In granting the extension, the Department of the Interior indicated that “[s]hould additional time be necessary, the Act of February 25,1925 * * * is still available to the entry.” The Land Office decision dated November 8, 1961, which recognized the assignment of the Hendrix entry to plaintiff, stated that, “The entry expires on May 9,1964 and final proof is due on or before that date.”
7. When plaintiff purchased the entry assignment from Lester Hendrix in 1961, 80 acres of the 160-acre entry were under lease from Hendrix to the Navy Department for use as part of a parachute-testing facility. The lease provided that the lease period was to end June 30, 1962, with an option to the Navy for a 1-year renewal, but that “no renewal shall extend the period of occupancy beyond June 30, 1963.” The lease also reserved to the Navy ingress and egress rights over the remaining 80 acres of the entry land for the purpose of “recovery of certain objects, equipment, and personnel as may be necessary in connection with the operations of the nearby Joint Parachute Drop Test Facility and the Whirltower Parachute Drop Test Facility.” The experimental whirltower, located about 250 feet north of the entry land, was used in conjunction with the Department of Defense Joint Parachute Test Facility.
After Hendrix assigned the entry to plaintiff in 1961, plaintiff so notified the Navy Department. The Navy recognized the assignment and thereafter paid rent ($480 per *980 annum) to plaintiff. The 80-acre portion of the land leased to the Navy is situated between the Fillaree Canal and the remaining 80 acres, and occupies that portion of the land over which water would most feasibly, reasonably and economically be brought to irrigate the land.

Negotiations With the Navy Department and the Department of the Interior

8. On August 9,1961, prior to the assignment of the entry from Hendrix to plaintiff, plaintiff wrote to the Navy Department, Public Works Office, San Diego, California, to find out whether the Navy was interested in terminating the lease it had with Hendrix on 80 acres of the entry land. Plaintiff noted that a “physical examination of the land discloses that the Naval facilities located thereon [including a four-inch water pipeline] are apparently abandoned and no longer used.” Plaintiff offered to discuss buying the pipeline from the Navy, presumably for use as an irrigation facility.
9. On September 18, 1961, the Navy responded to plaintiff’s letter, advising that there was “a current and immediate future need for the Government’s use of these lands [and the pipeline] ” and that “termination of the Hendrix lease at this time is not possible.”
10. On May 15, 1962, about a month before the Navy’s lease expired, the Navy Department notified plaintiff that it elected to exercise its option to renew its lease on 80 acres of the entry land from July 1, 1962 to June 80, 1963.
11. On June 4,1962, plaintiff met with Navy Department representatives to discuss problems relating to the conflict created by the Navy’s continued need for the land and plaintiff’s requirement to perfect the entry right before May 9, 1964. In a letter dated June 4, 1962, plaintiff noted, among other things, that he “would be unwilling to voluntarily execute another lease with the Navy after the expiration of this present lease [i.e., June 30, 1963]” because he would thereby be “precluded from making the necessary improvements required by the Department of the Interior to receive *981 a patent from the government for said land.” Plaintiff suggested working out some arrangement “between the Navy Department and the Department of the Interior, whereby a patent would be issued * * * upon the execution of a future lease to the Navy.”
12. On August 8, 19.62, the Navy Department wrote to plaintiff, in part as follows:
This Division has conducted an extensive series of correspondence with the Bureau of Land Management, in an effort to arrive at a satisfactory solution of the problem which you outlined in your letter of June 4th, concerning Desert Land Entry L.A. 039198. Various proposals were made by both parties but none of these proved to be acceptable; however, by letter of August 3, 1962, the Manager of the Land Office at Kiverside, California, made the following statement: “Examination of the case record indicates that subject entry has been allowed extensions under the 1908 and the 1912 Acts. The three year extension under the latter act carries the entry to May 9, 1964. Subject entry still has available a possible three year extension under the 1925 Act. Inasmuch as this entry was allowed prior to 1915, it appears that it may be possible to grant a three year extension under the Act of March 4, 1915”.
The three year extension under the Act of March 4, 1915, was a suggestion made by this Division. The action proposed under the 1908 and 1912 Acts was volunteered by the Bureau of Land Management. The letter further states that if the holder of the entry can justify the extension under both the 1915 and 1925 Acts, it is possible that the entry could be extended until May 9,1970.
If Mr. Clarkson is willing to accept this course of action, it appears that adequate justification can be presented and a mutually acceptable agreement worked out. Please advise as to Mr. Clarkson’s feelings in this matter.
13. On April 22, 1963, about a month prior to expiration of the Navy lease as extended under its option, plaintiff wrote to the Navy Department, again noting that there had been no resolution of the conflicting interests, earlier discussed. Plaintiff pointed out to the Navy that final proofs must be submitted to the Department of the Interior by May 9, 1964, and that “it will be of assistance to us to know the desires of *982 the Department of the Navy in regards to this land at as early a date as possible.” Plaintiff made several proposals: (a) outright purchase of the land by the Navy for $25,000, (b) a new lease to the Navy contingent on plaintiff’s getting fee simple title to the land, or (c) a new lease to the Navy contingent on the Navy’s willingness to install the necessary irrigation system so that proofs could be submitted by plaintiff to the Department of the Interior on or before May 9, 1964.
On April 22, 1968, plaintiff also wrote the Department of the Interior, requesting a 3-year extension (to May 9, 1967) to submit proofs. Plaintiff noted that he did not “know the intention of the Department of the Navy. However, since this land has been used for a national defense purpose it is possible the Navy will want to continue to use the land.”
14. On April 30, 1963, the Department of the Interior responded to plaintiff’s letter of April 22, 1963, stating that the request for extension of time “is a little premature” and should -be made “approximately 90 days prior to the end of the statutory period * *
15. On June 30,1963, the Navy lease, as extended, expired. However, the Navy continued to occupy and use the land without a lease and plaintiff took no action to prevent it. Pather, plaintiff and the Navy continued their negotiations in an effort to work out an arrangement acceptable to all concerned.
On September 26, 1963, the Navy Department wrote to plaintiff, indicating that it desired a new lease to cover the period from June 30,1963 to June 30,1968. The Navy noted plaintiff’s reluctance “to enter into a new lease * * * [which] might prejudice your rights to file the necessary proof with the Department of the Interior * * * [by] May 9, 1964.”
16. On September 27,1963, plaintiff wrote to the Department of the Interior, setting out in detail the extensive background of the conflicting problems with the Navy and requesting, among other things, an extension of time to make final proofs. The Department of the Interior did not respond until February 24,1964, at which time it noted that an extension, up to 3 years, was possible only “in the event of some *983 unavoidable delay in the construction of irrigation works * * It further noted—
* * * it cannot be said that the terms of the [Navy] lease constitute * * * an unavoidable delay. The record does not indicate that the lease has restricted development. * * * It appears only reasonable that reasons other than the Navy lease would have to be advanced to warrant consideration of an extension.
17. On March 3, 1964, the Navy Department wrote to plaintiff, summarizing the various correspondence and conferences between plaintiff and the Navy to date. The Navy letter said in part [all emphasis supplied]:
1. Government Lease NOy(B)-59432 entered into with Mr. Hendrix, covering 80 acres of land, was acquired by Stephen Clarkson during the term of the lease which expired June 30,1963. Since the expiration of the lease, Mr. Clarkson has acquiesced to the continued use of the land by the Department of the Navy.
2. Attempts to negotiate a new and succeeding lease covering the Clarkson DLE interests were unsuccessful. It is the understanding of this Division that the reluctance on the part of Mr. Clarkson to enter into a new lease is entirely based upon the fact that a new lease might prejudice his right to file the necessary proof with the Department of the Interior in order to obtain a patent on his land.
3. During the course of lease negotiations, Mr. Clark-son was informed that the Navy had no authority to purchase fee title to the property, but the acquisition of a leasehold estate was considered imperative.
4. The Navy requires exclusive use of the land as the military requirements are not compatible with agricultural development, unless an arrangement could be made to coordinate the land development with the operation of the Navy facility. Mr. Clarkson was not formally offered the right to irrigate amd agriculturally develop his entry during the period of occupancy by the Navy.
5. The mission of the Navy facility for which the land is required is firm for the foreseeable future.
6. This division has informed the Department of the Interior, Bureau of Land Management, Eiverside, California, of the Navy’s requirements in connection with Mr. Clarkson’s DLE and has worked with that Bureau *984 in an effort to secure a satisfactory solution to the problem. To date the matter has not been resolved.
Y. It appears that Mr. Clarkson is agreeable to lease the entire 160-acre Entry provided that such a lease does not prejudice his right to ultimately develop the land or obtain a patent from the Department of the Interior.
18. On March 10,1964, plaintiff filed an application with the Department of the Interior for an extension of time of 3 years to submit final proofs, pursuant to the Act of February 25, 1925, 43 Stat. 982, 43 U.S.C. § 336. On March 20, 1964, the Department of the Interior denied plaintiff’s application, noting that “the entryman has not shown that some imavoidcible delay in the construction of irrigation works * * * has occurred for which he was not responsible and could not have readily foreseen. * * * The issues raised by the entryman regarding past, present, and future use of the lands in the subject entry by the U.S. Navy are not pertinent to the issue at hand regarding extension and are not herein considered.” On April 13, 1964, plaintiff filed an appeal to the Director, Bureau of Land Management, pursuant to 43 C.F.B. § 221.1 (now § 1842.2).
19. By letter dated April 15, 1964, 2 days after filing the appeal, plaintiff advised the Department of the Interior in part as follows:
Since the filing of the appeal there has been a radical change in the situation. The Department of the Navy in Washington has informed Mr. B. G. Meunch, Director, Beal Estate Division, U.S. Navy Bureau of Yards and Docks, Southwest Division, San Diego, California that the Navy is now willing to enter into a licensing agreement with the entryman whereunder the entryman will have the right to irrigate and agriculturally develop the entry land. Details of this license agreement are expected to be ironed out within the next ten days. This will remove the threat of lease condemnation or eminent domain proceedings by the Navy against the entryman.
I have discussed this new development with Mr. Cor-rigall of the Biverside office. He has informed me that under these new circumstances the Biverside office will have no hesitancy in granting the entryman a three year extension of time in which to file final proof. However because the Biverside office has already rejected the *985 entryman’s original application for a three year extension and an appeal has been filed, Mr. Corrigall informed me that jurisdiction is presently outside of the Riverside office and with the Bureau in Washington.
Under these circumstances Mr. Corrigall has advised me that the proper and most expeditious manner of handling the situation is to inform the Washington office of the new circumstances and request that the file be returned to the Riverside office for re-evaluation.
20. On April 20, 1964, the Navy Department wrote to plaintiff, confirming plaintiff’s letter of April 15,1964, to the Department of the Interior, as follows:
This letter confirms the understanding which was reached at a conference on Monday, 20 April 1964, among representatives of this Division and Attorney Dessau Clarkson, representing Stephen H. Clarkson, the entry-man under the above-captioned Desert Land Entry.
Pursuant to said understanding you are advised that there should be no difficulty in formalizing a License Agreement or Drop Permit from Clarkson whereby the Navy will acquire the right to parachute objects onto the land. It is anticipated that the document will be approved by the Navy within the next four weeks.
When this agreement is signed and approved, as anticipated, Mr. Clarkson will have the right to irrigate and agriculturally develop his land. Such use is not incompatible with Navy requirements.
Under these circumstances, there is no foreseeable Navy requirement which would necessitate the filing of a leasehold condemnation action or other eminent domain proceedings on behalf of the Navy.
On July 23, 1964, plaintiff and the Navy Department entered into a new lease. Though the date of execution of the lease was July 23, 1964, plaintiff withheld sending the executed document to the Navy, pending the outcome of his appeal to the Department of the Interior. The new lease covered the entire 160-acre entry land and provided for payment to plaintiff of $720 per year for the period July 1, 1963 to June 30,1965.
21. While plaintiff’s appeal to the Director, Bureau of Land Management, was pending, the Navy Department wrote *986 a letter dated January 7,1965, to the Department of the Interior, in part as follows:
The Navy has used the property since the expiration of the lease on June 30,1963 without benefit of a lease. It is the understanding of this Division that Mr. Clarkson’s reluctance to enter into a new agreement is based upon a final decision on the part of the Bureau of Land Management for an extension of time to allow him to irrigate and agriculturally develop the land for patent.
In order to satisfy the requirements of both the Navy and the Department of the Interior a proposed Permit Agreement providing for joint use and occupancy of the premises has been approved by the Navy and submitted to Mr. Clarkson for consideration.
It is understood that the entryman, Mr. Clarkson, has filed an appeal to the Decision of the Bureau of Land Management which rejected application for extension of time to submit final proof. This Division has been informed that execution by Mr. Clarkson of the proposed agreement covering joint use of the land is pending favorable consideration of the appeal by the Bureau of Land Management.
The using facility requirements [sic] now make it possible to coordinate the entryman’s land development with the operation of the Navy facility. Consummation of the proposed Permit Agreement will not only provide the Navy’s right for use of the land but will justify payment of rental for past and continued use of the land.
It will be appreciated if you will inform this Division of the present status of subject Desert Land Entry.
22. On March 25, 1965, plaintiff’s appeal to the Director, Bureau of Land Management, was denied. The decision was bottomed on the 1963 Supreme Court case of Arizona, v. California (finding 3(d)), and held that “it would be contrary to the public interest to grant any of the discretionary relief afforded to entrymen under the desert land laws [i.e., an extension of time to make proof] * * * where the entry is situated in California and requires water from the Colorado Biver for its reclamation.” The decision made no reference to plaintiff’s earlier dealings with the Navy Department. The entry right was canceled on April 19,1965.
*987 23. On July 16, 1965, the Secretary of the Interior wrote to plaintiff as follows:
This responds to your letter regarding the decision of this Department rejecting your request for an extension of time in connection with your desert land entry.
I have reviewed the matter, and, although I can sympathize with your predicament, I am compelled to concur in the action taken. The water shortage problem in the Pacific Southwest is critical. California is already taking more than is her entitlement under the Supreme Court’s decision in Arizona v. California, 373 U.S. 546 (1963). It is anticipated that the problem will become even more acute.

Plaintiffs Efforts to Prove Up the Entry

24. When plaintiff acquired the entry by assignment in 1961, the entry land was in an unimproved state; and at no time thereafter did plaintiff make improvements. On March 23, 1962, several months after acquiring the entry right, plaintiff wrote to International Agricultural Services, Inc., San Francisco, California, requesting information about appraising and developing the land. In a letter dated March 29, 1962, International advised plaintiff that (a) the property could be appraised for a fee of about $400, (b) the cost of development would depend on the expenses of leveling and preparation for irrigation, and (c) if farming was contemplated, soil quality and drainage characteristics should be investigated. It is not clear from the record what further steps plaintiff took between 1962 and 1964 (while negotiating with the Navy Department and the Department of the Interior) to prepare for improving the land. The reasonable inference to be drawn from the testimony and exhibits is that no positive steps were taken, but that plaintiff made various informal inquiries concerning financing, development, etc.
25. In April 1964, about 1 month before expiration of the entry (May 9, 1964) and after plaintiff was advised by the Navy Department that the terms of the new Navy lease would be compatible with agricultural development of the entry *988 land, plaintiff, through Margaret J. Neuter of Neuter Nealty, Solana Beach, California, did the following:
(a) Secured an easement from Westmoreland to install the necessary pumps and irrigation ditches across Westmore-land’s land to plaintiff’s land;
(b) Made arrangements with one George Kodaman, who was cultivating Westmoreland’s land, to till 20 acres of plaintiff’s land and plant seed;
(c) Got an estimate from Lucky Ditch Liners, Inc., El Centro, California, for installing the necessary irrigation equipment to service the full 160 acres of the land ($74,187.52, or $463.67 per acre);
(d) Agreed with one Walter Kauh, of El Centro, to grade and level the land, and
(e) Contracted with Neuman Engineering Company, El Centro, to make an elevation map of the full 160 acres.
None of the above work was accomplished.
26» The record does not establish that plaintiff ever made arrangements to finance the improvements necessary to prove up the entry. However, it is reasonable to infer from the testimony and documents of record that financing was available, generally, to entrymen seeking to develop desert land in the Imperial Valley of California between 1961 and 1964; but that the difficulties plaintiff encountered with respect to the Navy’s continued need for and use of the land raised a serious impediment to plaintiff’s negotiating for and obtaining financing.
27. The time required to improve desert land so to satisfy the requirements set out in finding 3 (a) depends on the size, location and nature of the land. The record shows that land of the general size, location and nature of plaintiff’s land could be proved up in as little time as 2 months. Therefore, when plaintiff acquired the entry right in late 1961, knowing that the Navy lease, even if extended, would expire on June 30,1963, it was reasonable for plaintiff to expect that he could prove up the entry between June 30, 1963 and May 9, 1964, a period of over 10 months. In view of the express terms of the Navy lease, i.e., that “no renewal shall extend the *989 period of occupancy beyond June 80,1963” (emphasis added), plaintiff was justified in believing that he could make the necessary improvements without interference by the Navy.
28. In sum, the record supports the following ultimate findings:
(a) Plaintiff acquired the desert land entry in 1961 with the reasonable expectation that it could be proved up before the expiration date of May 9,1964.
(b) Plaintiff made all reasonable efforts, under the circumstances, between 1961 and May 9, 1964, to arrange for proving up the entry in accordance with the requirements set out in finding 3 (a).
(c) Plaintiff’s failure to invest the time and money necessary to prove up the entry before May 9, 1964, was principally, if not wholly, the result of the Navy’s delay in agreeing to a new lease under which plaintiff could develop the land agriculturally.
(d) Between 1961 and May 9, 1964, it was not reasonable for plaintiff to proceed with development of the 80 acres of the entry land not under lease to the Navy Department because (i) economically and technically, the construction of irrigation works required use of the leased land and (ii) the uncertainty of the Navy’s future needs for the entry land precluded investment of substantial funds for developing any part of the land.
(e) By the time the Navy Department informed plaintiff (April 15,1964) that it would agree to a new lease compatible with plaintiff’s requirements to prove up the entry, less than 1 month remained before the entry expired. This was insufficient time to do the work necessary to prove up the entry.
(f) The decisions of the Department of the Interior denying a further time extension to plaintiff to prove up the entry resulted in a forfeiture of all of plaintiff’s rights to the land entry. While the decisions were within the Department’s discretion, they would have been unnecessary in the first instance if proper regard had been given to the conflicting requirements of the Navy Department and the dilemma caused to plaintiff thereby.

*990
Value of the Land

29. Both parties introduced evidence to establish the value of plaintiff’s entry land between 1961 and 1969. The evidence is summarized in findings 30 to 37 below.
30. In 1961, plaintiff paid $12,050, for the assignment of the entry right comprising 160 acres of unimproved land ($75 per acre).
31. In April 1963, plaintiff offered to sell the entry right to the Navy for $25,000 ($156 per acre). The Navy did not accept the offer nor did it state whether it considered the offer to be reasonable.
32. Plaintiff, an experienced real estate appraiser, testified at trial. Though he never made a detailed study or analysis of the land’s value, he was of the opinion that the land, in its unimproved state, had a fair market value in 1964 of between $32,000 ($200 per acre) and $40,000 ($250 per acre). He also testified that, in his opinion, the fair market value of the land in 1961 was $40,000 ($250 per acre), even though he bought the entry right in that year for $12,050 ($75 per acre). In plaintiff’s opinion, the purchase price of $12,050 was below the fair market value because the seller (Lester Hendrix) was interested in quick liquidation in order to pay his real estate agent for past debts. In view of the wide discrepancy between the entry-right sale price in 1961 and plaintiff’s opinion of fair market value in that year, and in view of the fact that plaintiff’s opinion of fair market value was not based on comparable sales or other more rigorous indicia of land value, plaintiff’s testimony of fair market value in 1961-4 is not persuasive and is entitled to little weight.
33. Plaintiff’s brother, Dessau Clarkson, who is an attorney and has represented plaintiff in all dealings with the entry right in suit, testified at trial that in June 1965, one Cliff Hurley, a real estate broker in El Centro, California, made him an unsolicited oral offer for the entry land. Clark-son testified that Hurley stated that he (Hurley) had a client willing to pay $40,000 for the land in its unimproved state. No details of the offer were given. According to Clarkson, *991 Hurley did not know (in June 1965) that plaintiff’s entry right had been canceled earlier. Defendant’s expert witness testified, however, that he interviewed Hurley in 1969 while preparing an appraisal report on the entry in suit and that Hurley had no recollection of having made any offer to Dessau Clarkson. Hurley did not testify at trial, his absence was not explained, and the conflict in testimony thus remains unresolved. Accordingly, any valuation of the land based on this testimony is entitled to little weight.
34. On Juiy 10,1968, Cal-West Mortgage Services, a lending institution in Encinitas, California, replied to a request from Dessau Clarkson and stated that, generally, land in the El Centro-Brawley area of the Imperial Valley, if developed and “ready for cultivation,” was worth “probably in the neighborhood of $1,000 per acre.” No estimate was given for unimproved land, nor was any specific estimate given for plaintiff’s entry land. Cost of development of plaintiff’s land was estimated to be $50-60,000.
35. At the hearing on June 12,1968, before Subcommittee No. 2 of the House Judiciary Committee (finding 1(b)), Jerry A. O’Callaghan, Chief, Office of Legislation and Cooperative Delations, Bureau of Land Management, Department of the Interior, testified that an “informal” evaluation (apparently made in 1968) of land situated in the general vicinity of plaintiff’s entry was $600-650 per acre when fully improved and under cultivation for 3-5 years. Under such circumstances, plaintiff’s land would have been worth between about $96,000 and $104,000 in 1969 if developed and first cultivated in 1964.
36. Eoy H. Davidson, an experienced appraiser in the Imperial Valley of California and an employee of the Department of the Interior, testified at trial as defendant’s expert. In 1969, in preparation for this litigation, Davidson prepared an extensive and comprehensive appraisal report which was introduced into evidence and formed the basis for his testimony. The report, which for the most part is not challenged by plaintiff, analyzes the value of plaintiff’s entry land from the standpoint of comparable sales. The analysis includes a survey of sales within the pertinent time period *992 of (a) desert land entries, (b) unimproved land held in fee, and (c) improved land. Davidson inspected the land in question on several occasions and his appraisal report is based on the rigorous standards generally accepted in land valuation cases. Davidson concluded as follows:
(i) The value of the entry land as of July 1, 1983 (when the Navy lease expired) was $10,400 ($65 per acre) .
(ii) The value of the entry land as of May 9,1964 (when the entry right expired) was $10,400 ($65 per acre).
(iii) The value of the entry land as of May 9,1964, assuming sufficient work had been done to satisfy final proof requirements, would have been $45,100 ($282 per acre). This figure was arrived at by summing up $10,400 (the value of the land unimproved) and $34,700, which represents the minimal cost of (a) constructing irrigation facilities for the entire 160 acres and (b) cultivating 20 acres (one-eighth of the land).
(iv) The value of the entry land (unimproved) as of July 15, 1969 (date of defendant’s appraisal) was $8,000 ($50 per acre).
(v) The value of the entry land as of July 15,1969, assuming it had been developed and farmed, was $64-72,000 ($400-450 per acre).
In view of the completeness and thoroughness of Davidson’s appraisal report, it is entitled to considerable weight.
37. In sum, the evidence supports the following ultimate findings on valuation:
(a) The value of the unimproved land (160 acres) in plaintiff’s entry between 1961 and 1964 was minimally $10,400 and maximally $12,050, the amount which plaintiff paid for the entry right in 1961. Of the two figures, the higher one is more appropriate because it represents the price arrived at between a willing buyer and a willing seller in an arm’s-length transaction.
(b) Had the entry been developed between 1961 and 1964, to the extent necessary to make final proofs by 1964, the value would have been about $45,000. However, to attain that value, plaintiff would have had to invest minimally about $35,000, which in fact plaintiff did not invest.
*993 (c) Etad tbe entry been developed and farmed for several years between 1964 and 1969, its value would bave been between about $64,000 and about $100,000, tbe total cost of development ranging from about $35,000 to about $60,000.
38. At trial, plaintiff offered no evidence regarding attorneys’ fees and other expenses relating to proving up tbe entry right. However, in bis memorandum submitted to the Blouse Judiciary Committee during bearings on H.R. 3736, in evidence, plaintiff alleged tbe following relevant expenses: value of services of real estate brokers who made arrangements with contractors, etc., in April 1964 to prove up tbe entry, $1,000 (of this amount $500 is considered reasonable); estimated cost to plaintiff of various trips and conferences with tbe Navy Department and tbe Department of tbe Interior between 1961 and 1964, $1,500. These two items, to a total of $2,000, are considered reasonable expenses under tbe circumstances.
39. The mentioned memorandum alleges legal services, including costs advanced, up to June 1968 at $2,750. Plaintiff offered no evidence of reasonable attorneys’ fees incurred since that time. Giving due regard to all tbe time and effort expended by counsel in this proceeding, reasonable attorneys’ fees are $2,500.
40. Plaintiff should be entitled to interest on tbe value of tbe entry bis investment therein, $12,050), running from May 9,1964, tbe date tbe entry right expired, up to tbe date of payment, presumably early 1971. This is approximately 7 years. Though interest rates have varied over tbe past 7 years, a reasonable average is 5 percent, the total interest therefore being $4,218.
41. Plaintiff’s compensation comes to $20,768, arrived at by summing up $12,050 (finding 37 (a)), $4,500 (findings 38 and 39), and $4,218 (finding 40). Any compensation based on the value of tbe entry land if improved, or if improved and farmed, would be speculative and hence would be a gratuity.
42. From 1961 to 1965, plaintiff received rent from the Navy under tbe Navy leases, but also paid taxes and assessments on tbe entry land to tbe state of California or a subdivision thereof. Tbe exact amount of tbe receipts and pay *994 ments is not clear from the record. In any event, they are not large, would tend to wash, each other out of any calculation for compensation, and thus are ignored.